## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| **DAWN PLUMMER**, individually, and on behalf of all others similarly situated, 313 South C Street Hamilton, OH 45013 | Case No. |
| | Judge |
| Plaintiff, | Magistrate Judge |
| v. | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| **BOB EVANS RESTAURANTS, LLC** c/o CT Corporation System, Reg. Agent 4400 Easton Commons Way, Suite 125 Columbus, OH 43219 | (with jury demand endorsed hereon) |
| -and- | |
| **VIRGINIA TOUR** c/o CT Corporation System, Reg. Agent 4400 Easton Commons Way, Suite 125 Columbus, OH 43219 | |
| Defendants. | |

Plaintiff Dawn Plummer ("Plaintiff"), individually and as representative of a class of participants and beneficiaries of the Bob Evans 401(k) Retirement Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Plan sponsor, Bob Evans Restaurants, LLC ("Bob Evans"), and Virginia Tour from Bob Evans, who is the signatory to the Plan's annual Form 5500 filed under sections 104 and 4065 of ERISA and sections 6057(b) and 6058(a) of the Internal Revenue Code ("Form 5500") since at least 2017 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.     Plaintiff is a participant in an ERISA defined contribution plan sponsored by her employer, Bob Evans. Bob Evans's Plan is a defined contribution plan, created under 26 U.S.C. § 401(k), where employees bear the market risk and must pay the fees and expenses of investment options.   These types of retirement plans have replaced the defined pension plans of yesteryear that employers used to offer, and they have become America's primary retirement system.

2.     Unlike defined-benefit pensions, which provide set payouts for life and where an employer assumes the risks and pays the fees and expenses of the investment, 401(k) accounts rise and fall with financial markets.

3.     The proliferation of 401(k) plans has resulted in far more financial risk for workers and exposure to big drops in the stock market and high fees from Wall Street money managers. These retirement funds are significant to the welfare of the class. Plaintiff estimates that Defendants have caused losses of more than $10,000,000 to the Plan in total since 2019.

4.     The marketplace for services for defined contribution plans is established and competitive. Large plans, such as the Plan administered by Bob Evans, have sufficient bargaining power to secure high quality, competitively priced administrative and investment management services.

5.     As ERISA fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2001). In discharging these duties, ERISA fiduciaries are held to the standard of

2

financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

6.     The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments, as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.")

7.     In this case, fiduciaries to the Plan failed to meet their fiduciary obligations in several basic ways. First, the Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants, and resulted in a loss of compounded returns. This is one of the most common and well-known examples of an imprudent investment decision.[1] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring mutual fund share classes.

---

[1] The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf (last visited Feb. 20, 2025); *see also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf (last visited Feb. 20, 2025)

8. For a large plan of approximately $100,000,000 in net assets, such as this Plan, a fiduciary using a viable methodology should be monitoring the Plan's investment options continuously and immediately take advantage of share class discounts as they become available.

9. Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the SEC.

10. Based on this information, it is apparent that Defendants failed to monitor the share classes of mutual fund investments and substitute less expensive share classes of mutual funds from more expensive share classes of the very same mutual fund; thus, wasting the assets of the Plan participants.

11. This could have been easily remedied if Defendants had a viable review process and methodology, which they neglected to keep and implement; thus, violating their duty of prudence.

12. Second, Defendants wasted participants' money by failing to appropriately select and monitor the Plan's stable value fund. Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants. Had Defendants monitored and evaluated the returns on the Plan's stable value fund, they would have realized that the Plan's stable value fund was an underperforming fund throughout the entire Class Period (defined *infra*) and the Plan's parties in interest were benefitting from the returns on the stable value fund, at the cost of the Plan's participants.

13. Third, Defendants failed to monitor the Plan's fees and expenses. As a result, the Plan kicked back payments to recordkeepers and other non-parties from the retirement savings of Bob Evans's employees in excessive amounts, thereby diminishing the value of the employees' retirement fund without justification.

14. Importantly, Plaintiff is not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed to make informed and prudent decisions is readily available to Defendants and was available at the time these decisions were made.

15. However, Defendants failed to make prudent decisions and breached their fiduciary obligations to Plaintiff and the class.

16. Plaintiff, individually and as the representative of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Bob Evans Plan any lost profits. Plaintiff also seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

17. Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

18. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

19. This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District and Division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## PARTIES

20.     Plaintiff Dawn Plummer resides in Hamilton, Ohio and, at all times relevant to this action, was an employee of Bob Evans and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[2] because she and her beneficiaries were eligible to receive benefits under the Plan.

21.     The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of Bob Evans who have met the service requirements of the Plan. Throughout the Class Period, the Plan had between 10,000 and 30,000 participants and between $89,837,765 and $111,849,017 in assets.

22.     Defendant Bob Evans, a Delaware limited liability company, is the sponsor and administrator of the Bob Evans Plan and maintains its place of business at 8111 Smith's Mill Rd., New Albany, OH 43054.  The Plan's annual Form 5500 Reports filed during the Class Period identify Bob Evans as the sponsor and "Plan Administrator" of the Plan.

23.     Per Form 5500 Reports filed during the Class Period, the Administrative Committee of the Plan controls and manages the operation and administration of the Plan. Upon belief, the Board of the Directors of Bob Evans appointed the Administrative Committee of the Plan. The names of the individuals on the Board of Directors and the Administrative Committee during the relevant time period are unknown at this time, and they may be added as defendants through amendment of this Complaint.

---

[2] Under ERISA, claims for breach of fiduciary duty may be brought "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins on the date that is six years prior to the date of the filing of this Complaint.

24. Defendant Virginia Tour is a signatory to the Form 5500 Reports filed during the Class Period. The Form 5500 Reports identify her as "name of individual signing as plan administrator."

25. Defendants Bob Evans and Virginia Tour are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available.

26. Though not named as Defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. At the beginning of the Class Period, Bob Evans contracted with (i) Prudential Bank & Trust, F.S.B. and Prudential Retirement Insurance and Annuity Company to serve as trustees of the Plan, and (ii) Prudential Retirement Insurance and Annuity Company to serve as the third-party administrator, to process and maintain the records of participant data. They served in these roles until 2022, when Empower acquired the retirement business of Prudential, and Bob Evans contracted with (i) Prudential Bank & Trust, F.S.B.,[3] Empower Annuity Insurance Company, and Empower Trust Company, LLC to serve as custodians of the Plan, and (ii) Empower Annuity Insurance Company to serve as the third-party administrator, to process and maintain the records of participant data. They served in these roles through the remainder of the Class Period. These entities will hereafter be collectively referred to as "Prudential" or "Prudential/Empower."

---

[3] In 2023, Prudential Bank & Trust, F.S.B. was merged into Empower Trust Company, LLC as part of the acquisition by Empower Retirement.

27.     After Empower acquired the retirement business of Prudential in 2022, Empower kept the Prudential products and essentially has kept the Plan in the same structure thereafter. Prudential/Empower hold the Plan's investment assets and execute investment transactions. The Prudential/Empower entities are each a "party in interest" to the Plan, whose services and compensation Defendants had a duty to monitor.

**DEFENDANTS' FIDUCIARY OBLIGATIONS**

28.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. § 1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and − (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

29.     29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

30.     29 U.S.C. § 1106(a)(1)(C), 29 U.S.C. § 1108(b)(2), and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than

reasonable compensation is paid therefor." Prudential is a "party in interest" under 29 U.S.C. § 1106(a)(1)(C).

31.　　ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. Section 1105(a) states, in relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

32.　　29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

33.     Plaintiff has relied upon limited documents provided by Defendants, including disclosures under 29 CFR § 2550.404a-5 ("404a-5"), the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), and mutual fund prospectuses available on the SEC's EDGAR database.

## FACTUAL ALLEGATIONS

34.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions, plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.      Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

35.     A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses, and other costs.

36.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (*i.e.*, sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share

10

classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen.

37.    Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan, since institutional investors make large fund share purchases, and higher class shares are typically retail class shares which are available to a broader spectrum of investors.

38.    The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk` characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

39.    Defendants had access to these low-cost institutional share classes of mutual funds, as the Plan could easily meet the minimum investment requirements. Instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendants instead offered higher cost mutual fund share classes as investment options for the Plan. Thus, the Plan fiduciaries wasted the assets of the Plan by failing to monitor the available share classes and failing to select the lowest share class of the funds for inclusion in the Plan menu. This failure continued from the beginning of the Class Period until the present, in some cases.

40. Throughout the Class Period, Bob Evans used higher fee share classes of mutual funds when lower class shares were readily available.

41. The following are some instances in which Defendants wasted money by failing to select the lowest-cost share class of the mutual fund as an option in the Plan. For illustrative purposes, Plaintiff will use Plaintiff's statement disclosures from throughout the Class Period, and while exact fee levels vary slightly over the Class Period, the differential has remained constant.

42. Defendants chose American Funds EuroPacific Growth Fund Class R5E (RERHX) as an investment option available to participants in the Class Period. Defendants chose to select share class R5E, which showed an expense ratio of .62% in 2021.

43. During the same year and throughout the Class Period, another share class of the EuroPacific Growth Fund—American Funds EuroPacific Growth Fund Class R6 (RERGX)—had an expense ratio of 0.46%. These lower cost options were available to Defendants and easily identifiable in the prospectus and other sources. Defendants, however, failed to fulfill their duties and have continued to keep Plan investments in a higher fee option which had a higher cost to Plan participants, thus lowering their return.

44. Thereafter, Defendants chose American Funds EuroPacific Growth Fund Class R2 (RERBX) as an investment option available to participants in the Class Period. Defendants selected share class R2, which showed an expense ratio of 1.56%, which is even higher than the high fee share class R5E option that Defendants previously selected.

45. Defendants chose Allspring Special Mid Cap Value A Fund (WFPAX), which changed its name from the Wells Fargo Special Mid Cap Value A, as an investment option

available to participants in the Class Period. Defendants chose to select share class A, which showed an expense ratio of 1.14% in 2021.

46. During the same year and throughout the Class Period, another share class of the Mid Cap Value Fund—Allspring Special Mid Cap Value R6 Fund (WFPRX)—had an expense ratio of 0.71%. These lower cost options were available to Defendants and easily identifiable in the prospectus and other sources. Defendants, however, failed to fulfill their duties and have continued to keep Plan investments in a higher fee option which had a higher cost to Plan participants, thus lowering their return.

47. Defendants chose JPMorgan Mid Cap Growth R5 Fund (JMGFX) as an investment option available to participants in the Class Period. Defendants chose to select share class R5, which showed an expense ratio of 0.84% in 2021.

48. During the same year and throughout the Class Period, another share class of the Mid Cap Growth Fund—JPMorgan Mid Cap Growth R6 Fund (JMGMX)—had an expense ratio of 0.70%. These lower cost options were available to Defendants and are easily identifiable in the prospectus and other sources. Defendants, however, failed to fulfill their duties and have continued to keep Plan investments in a higher fee option which had a higher cost to Plan participants, thus lowering their return.

49. In fact, prior to the Class Period, Defendants had chosen the JPMorgan Mid Cap Growth R6 Fund as an investment option available to participants. However, Defendants subsequently selected share class R5, which has a higher expense ratio than the option that Defendants previously selected.

50. A table showing the foregoing examples is set forth below:

| **Fund Name** | **Fee for Bob** | **Lower Cost** | **Fee for Lower** |
|---|---|---|---|

13

| | Bob Evans Share Class | Evans Share Class | Share Class | Cost Share Class |
|---|---|---|---|---|
| American Funds EuroPacific Growth | RERBX | 1.56% | RERGX | 0.46% |
| Allspring Special Mid Cap Value | WFPAX | 1.14% | WFPRX | 0.71% |
| JPMorgan Mid Cap Growth | JMGFX | 0.84% | JMGMX | 0.70% |

51.     Investing Plan assets in higher share classes harms the Plan's participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but, rather, are tied to the amounts invested by Plan participants. Because the Plan could have invested in identical mutual funds with a lower share class, Defendants' actions were directly erosive to the Plan's growth. Defendants caused Plaintiff and other Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on the majority of investments offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time and substantially lowers the corpus of participants' retirement investments.

52.     In selecting share classes with a higher fee, Defendants demonstrated a lack of basic skill and prudence. When selecting investments, a prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[4]

---

[4] "OCIE's 2016 Share Class Initiative," National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available                                                                                                                   at:

14

53. The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments—with the same assets, investment style, and management—Defendants chose the more expensive product. Defendants caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan to provide income security for participants/beneficiaries.

**B. Defendants Wasted Participants' Money Because They Failed to Appropriately Select and Monitor the Plan's Stable Value Fund**

54. One of the largest assets in the Plan was the Prudential Guaranteed Income Fund ("Prudential GIF").

55. The Prudential GIF is a type of stable value fund known as an Immediate Participation Guarantee ("IPG"), structured as a group annuity contract. In 2022, Empower acquired most of Prudential's 401(k) business and continued offering the same contract under its own brand name.

56. A prudent fiduciary, recognizing the importance of the stable value fund in the Plan's investment lineup, would have taken great care in selecting and monitoring this investment option. Defendants did not

57. A stable value fund is a unique investment available only in ERISA defined contribution plans and certain other tax-advantaged plans. A stable value fund is a conservative, capital preservation investment product designed to provide steady, positive returns and pay a contractually guaranteed return known as a "crediting rate." The crediting rate is set by the

---

https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf&ved=2ahUKEwiEo7TJ09KLAxVyv4kEHY6pAZUQFnoECAUQAQ&usg=AOvVaw3m4zYERldSOcePEWdFLBRU (last visited Feb. 20, 2025)

contract and may be reset at predetermined intervals many times with wide discretion by the issuer.[5]

58.     A stable value account in a retirement plan has some similarity to a money market fund in that it provides benefit level liquidity and principal protection, and it is similar to a bond fund in that it provides consistent returns over time. It differs from both in that most bond funds and mutual funds are SEC registered mutual funds with a high level of regulation and transparency.  Stable value products contain insurance products at different levels which are state regulated.   This book value accounting treatment enables stable value, in general, to seek to generate returns greater than a money market and equivalent to a short—to intermediate—term bond fund. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time, *i.e.*, there is limited need for liquidity.  This enables fund providers to invest longer and offer better crediting rates (*i.e.*, the rate of return), and to guarantee participants will not lose money by guaranteeing the fund transacts at book value.

59.     Stable value funds are not SEC registered mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic fund. The differences between the different types of funds are critical from a fiduciary standpoint.

60.     The Prudential GIF, the stable value fund selected by Defendants, is a type of general account product ("IPG") fixed annuity subject to the terms of a state regulated insurance contract between the Plan and Prudential/Empower.   Taking on the single entity risk of Prudential is the riskiest version of stable value available.

---

[5] https://www.stablevalue.org/wp-content/uploads/Stable-Value-FAQ.pdf (last visited Feb. 20, 2025) ("The key difference between a GIC and a contract value wrap contract is that under a contract value wrap contract the ownership of the invested assets are owned by the plan…").

61.     During the Class Period, Prudential was offering far higher returns to other plans in Prudential GIF and other similar IPG products. Defendants could have obtained a significantly higher crediting rate from Prudential by just asking. This is comparable to a mutual fund share class violation.  During the Class Period, Prudential offered an IPG in its GIF share class for 6.8%, which was essentially similar to the Prudential GIF selected by Defendants. This caused the Plan to sustain damages from lost yield and returns of approximately $6,902,466, as follows:

| Plan Year | Bob Evans Prudential GIF Rate | IBEW Prudential GIF Rate | Damages (Compared to IBEW) | Year End Bob Evans GIF Balance |
|---|---|---|---|---|
| 2019 | 1.65% | 6.80% | $1,459,718 | $28,344,047 |
| 2020 | 1.65% | 6.80% | $1,469,226 | $28,528,666 |
| 2021 | 1.65% | 6.80% | $893,199 | $17,343,664 |
| 2022 | 1.65% | 6.80% | $832,972 | $16,174,210 |
| 2023 | 1.65% | 6.80% | $753,851 | $14,637,884 |
| 2024 | 1.65% | 6.80% | $746,750 | $14,500,000 |
| 2025 | 1.65% | 6.80% | $746,750 | $14,500,000 |

62.     As ERISA fiduciaries, Defendants had an obligation to review, monitor, benchmark, and negotiate the performance of the Plan's stable value separate account and to remove or replace it where a substantially identical investment option can be obtained at a lower cost. *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.").

63.     Prudential/Empower and their funds are clearly parties in interest, as they have the potential for a conflict of interest because Prudential/Empower—as the trustee, custodian and recordkeeper of the Plan, and also as the issuer of the Prudential GIF—may use their authority to cause themselves or an affiliate to receive compensation. For example, they charge and receive fees for performing the recordkeeping function, and for issuing the annuity. Thus, the Prudential GIF is a "prohibited transaction" under ERISA. *See* 29 U.S.C. § 1106(a)(1)(C).

64.     Defendants caused the Plan to engage in the annuity transactions relative to the Prudential GIF with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential/Empower and the Plan.

65.     Defendants, as fiduciaries, are responsible for verifying that ERISA's prohibited transaction exemptions (*i.e.*, PTE 2020-02 and PTE 84-24) apply to the insurance products they put in the Plan. This is especially relevant here, as Defendants are engaging parties in interest.

66.     The Prudential GIF does not qualify for a prohibited transaction exemption because, *inter alia,* the contract does not meet the Impartial Conduct Standards ("ICS"). For example, the Prudential GIF does not satisfy the ICS "care obligation" because the low returns for the single-entity credit risk and liquidity risk of the Prudential GIF do not reflect the required care, skill, prudence, and diligence (similar to the prudent person fiduciary standard). The Prudential GIF also does not satisfy the ICS "loyalty obligation" or the ICS "reasonable compensation limitation" because the Prudential GIF involves undisclosed spreads and commissions that place the financial interests of the insurers and their affiliates over those of retirement investors.[6] Indeed, Mark Grier, Vice Chairman of Prudential Financial, Inc., stated

---

[6]
https://www.warren.senate.gov/imo/media/doc/senator_warrens_annuity_report_-_sept_2024.pdf

that Prudential receives more than 2 percentage points of fees from the assets that are part of its annuity business.[7] *See* 29 U.S.C. § 1108.

## C. Defendant Did Not Have a Prudent Process for Selecting or Monitoring the Performance of the Prudential GIF

67. The crediting rate in an IPG, like Prudential GIF, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Defendants had an opportunity and duty to evaluate the stable value fund in advance. Thus, this is not a case of judging an investment with the benefit of hindsight. Defendants should have known, from the outset, that Prudential provided better crediting rates for the identical stable value fund (*i.e.,* the Prudential GIF) and that substantially similar products in and out of Prudential were available offering significantly higher crediting rates.

68. Defendants did not have to scour the marketplace to find a better performing fund. The terms and rates of stable value funds are published and readily available. All Defendants had to do was look. Defendants simply did not bother to find a better deal for the Plan participants. Defendants, therefore, did not exercise even a minimal amount of due diligence.

69. "It is defendant fiduciaries who bear the burden of pleading and proving that a § 1108 exemption applies to an otherwise prohibited transaction under § 1106." *Cunningham v. Cornell University*, 145 S.Ct. 1020, 1024 (2025). Here, Defendants will not be able to meet their burden. The foregoing demonstrates that Defendants failed to perform the required due diligence to demonstrate that every transaction relative to the Prudential GIF is both necessary and fairly compensated, as the combined total of all fees, commissions and other consideration received by Prudential/Empower and their agents was not reasonable.

---

[7]

https://www.bloomberg.com/news/articles/2013-03-06/prudential-says-annuity-fees-would-make-bankers-dance?embedded-checkout=true

**D.      Defendants Should Have Examined the Bond Fund Separate Account Annuity Contract**

70.      The largest holding in the Bob Evans Plan is the Prudential Bond separate account annuity contract that has averaged over $25 million of Plan participant money during the Class Period.  It has the same single-entity credit risk and liquidity risk as the Prudential GIF IPG fixed general account annuity.  Like the Prudential GIF, the participants in the Plan have no ownership in bonds or any other securities; they only have a contract.

71.      As set forth above, Prudential/Empower and their funds are clearly parties in interest, as they have the potential for a conflict of interest because Prudential/Empower—as the trustee, custodian and recordkeeper of the Plan, and also as the issuer of the Prudential Bond fund—may use their authority to cause themselves or an affiliate to receive compensation. For example, they charge and receive fees for performing the recordkeeping function, and for issuing the annuity. Thus, the Prudential Bond fund is a "prohibited transaction" under ERISA. *See* 29 U.S.C. § 1106(a)(1)(C).

72.      The Plan participants' money that is invested in the Prudential Bond separate account annuity contract is deposited into Prudential's general account, and is assigned to a subsection of the general account known as a separate account. Upon information and belief, the adjusted return of the general account of Prudential is approximately 2% higher than the return that Prudential pays to Plan participants in the Prudential Bond fund. As mentioned above, Mark Grier, Vice Chairman of Prudential Financial, Inc., stated that Prudential receives more than 2 percentage points of fees from the assets that are part of its annuity business.[8] Thus, the Plan participants in the Prudential Bond fund have a lower return on their investments than they

---

[8]

https://www.bloomberg.com/news/articles/2013-03-06/prudential-says-annuity-fees-would-make -bankers-dance?embedded-checkout=true

should have otherwise experienced, resulting in approximately $3 million in damages (*i.e.*, $25 million of Plan participant money times 2% spread times 6 years).

73. Defendants caused the Plan to engage in the annuity transactions relative to the Prudential Bond fund with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential/Empower and the Plan.

74. As set forth above, Defendants, as fiduciaries, are responsible for verifying that ERISA's prohibited transaction exemptions (*i.e.*, PTE 2020-02 and PTE 84-24) apply to the insurance products they put in the Plan. This is especially relevant here, as Defendants are engaging parties in interest.

75. The Prudential Bond fund does not qualify for a prohibited transaction exemption because, *inter alia,* the contract does not meet the Impartial Conduct Standards ("ICS"). For example, the Prudential Bond fund does not satisfy the ICS "care obligation" because the low returns for the single-entity credit risk and liquidity risk of the Prudential Bond fund do not reflect the required care, skill, prudence, and diligence (similar to the prudent person fiduciary standard). The Prudential Bond fund also does not satisfy the ICS "loyalty obligation" or the ICS "reasonable compensation limitation" because the Prudential Bond fund involves undisclosed spreads and commissions that place the financial interests of the insurers and their affiliates over those of retirement investors.[9] *See* 29 U.S.C. § 1108.

76. Here, Defendants will not be able to meet their burden of pleading and proving that a § 1108 exemption applies to an otherwise prohibited transaction under § 1106. *Cunningham,* 145 S.Ct. at 1024. The foregoing demonstrates that Defendants failed to perform the required due diligence to demonstrate that every transaction relative to the Prudential Bond

---

[9]

https://www.warren.senate.gov/imo/media/doc/senator_warrens_annuity_report_-_sept_2024.pdf

fund is both necessary and fairly compensated, as the combined total of all fees, commissions and other consideration received by Prudential/Empower and their agents was not reasonable.

77.     The Qualified Default Investment Alternative ("QDIA") in a plan bears an additional level of fiduciary oversight.   The QDIA in much of the Class Period was the Prudential Goalmaker program, which forced participants into the highest fee options outlined previously.

## **CLASS ACTION ALLEGATIONS**

78.     ERISA authorizes any plan participant or beneficiary to bring an action individually, and on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the Court may deem appropriate. See 29 U.S.C. § 1132(a)(2).

79.     Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify a class (the "Class") on behalf of participants and beneficiaries of the Plan. Plaintiff seeks to certify the following Class:

> All participants in or beneficiaries of the Bob Evans Retirement Plan from the date that is six years prior to the filing of the complaint in this matter through the date of judgment.
>
> Excluded from the Class are Defendants; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

80.     This action meets the requirements of Fed. R. Civ.P. 23 and is certifiable as a class action for the following reasons:

a.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2021, the Plan had over 4,656 participants with account balances.

b.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

  i.   whether Defendants are fiduciaries of the Plan;

  ii.   whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

  iii.   whether Defendants had a duty to monitor other fiduciaries of the Plan;

  iv.   Whether the selection of the Prudential GIF as a stable value fund was objectively prudent under prevailing circumstances;

  v.   Whether the QDIA's design violated fiduciary standards by funneling participants into higher-cost investments;

  vi.   whether Defendants breached their duty to monitor other fiduciaries and parties in interest to the Plan; and

  vii.   the extent of damage sustained by Class members and the appropriate measure of damages.

81.   Plaintiff's claims are typical of those of the Class because her claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiff will

adequately protect the interests of the Class and has retained counsel experienced in class action litigation.

82.     Plaintiff has no interests that conflict with those of the Class.

83.     Defendants do not have any unique defenses against Plaintiff that would interfere with her representation of the Class.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>
### Breach of Fiduciary Duties
### (Against All Defendants)

85.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.     Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). Defendants were obligated to discharge their duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

87.     Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments

of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

88.     As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached their fiduciary duties in various ways. Specifically, among other failings, Defendants (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; (ii) failed to prudently select and monitor the Plan's stable value fund; (iii) failed to prudently select and monitor the Plan's bond fund; and (iv) failed to delegate their duties prudently, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out their investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

89.     Each Defendant was in a position to monitor and oversee the performance of other fiduciaries and failed to do so.

90.     Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

91.     Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be

determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

92.     As a direct and proximate result of these breaches, the Plan, Plaintiff, and members of the Class suffered substantial losses in the form of higher fees and/or lower returns on their investments than they would have otherwise experienced.

**COUNT II**
**Breach of Fiduciary Duty to Monitor Excessive Fees**
**(Against All Defendants)**

93.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     Defendants were obligated to discharge their fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). In investing and managing the Plan's assets, Defendants were permitted to incur only appropriate and reasonable costs.

95.     Defendants failed to defray the Plan's recordkeeping expenses as required, and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's recordkeeping expenses were excessive, resulting in losses to the Plan participants.

96.     Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

97.     Moreover, Defendants failed to prudently monitor and control the Plan's recordkeeping expenses. A prudent fiduciary would have conducted regular benchmarking, negotiated lower fees, or solicited competitive bids through an RFP process to ensure the reasonableness of such expenses.

98.     Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of the Plan and all similarly situated Plan participants and beneficiaries, requests that the Court:

A.    Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class representative, and appoint Plaintiff's counsel as Class counsel;

B.    Find and declare that Defendants breached their fiduciary duties as described above;

C.    Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

E.    Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

F.     Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

G.     Disgorge any profits made by Defendants through the use of Plan assets, including any revenue-sharing or spread profits generated through excessive fees or insurance products tied to the Plan;

H.     Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

I.     Order the payment of interest to the extent it is allowed by law; and

J.     Grant other equitable or remedial relief as the Court deems appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

/s/ Marc E. Dann
Marc E. Dann (0039425)
Jeffrey A. Crossman (0073461)
Brian D. Flick (0081605)
**DannLaw**
15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr.
(*pro hac vice* anticipated)
**Zimmerman Law Offices P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
www.attorneyzim.com
tom@attorneyzim.com

firm@attorneyzim.com

*Attorneys for Plaintiff and the Class*