# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| **DAWN PLUMMER**, individually, and on behalf of all others similarly situated, 313 South C Street Hamilton, OH 45013 <br><br> Plaintiff, <br><br> v. <br><br> **BOB EVANS RESTAURANTS, LLC**, a Delaware limited liability company; **EMPOWER ANNUITY INSURANCE COMPANY**; and **EMPOWER TRUST COMPANY, LLC,** <br><br> Defendants. | Case No. 2:25-cv-0506 <br><br> Judge Michael H. Watson <br><br> Magistrate Judge Elizabeth P. Deavers <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> (with jury demand endorsed hereon) |

Plaintiff Dawn Plummer ("Plaintiff"), individually and as representative of a class of participants and beneficiaries of the Bob Evans 401(k) Retirement Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Plan sponsor, Bob Evans Restaurants, LLC ("Bob Evans"), and Plan Trustees, Empower Annuity Insurance Company and Empower Trust Company, LLC (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation, and administration of the Plan.

## INTRODUCTION

1.      Plaintiff is a participant in an ERISA defined contribution plan sponsored by her employer, Bob Evans. Bob Evans's Plan is a defined contribution plan, created under 26 U.S.C. § 401(k), where employees bear the market risk and must pay the fees and expenses of investment

options. These types of retirement plans have replaced the defined pension plans of yesteryear that employers used to offer, and they have become America's primary retirement system.

2. Unlike defined-benefit pensions, which provide set payouts for life and where an employer assumes the risks and pays the fees and expenses of the investment, 401(k) accounts rise and fall with financial markets.

3. The proliferation of 401(k) plans has resulted in far more financial risk for workers and exposure to big drops in the stock market and high fees from Wall Street money managers. These retirement funds are significant to the welfare of the class. Plaintiff estimates that Defendants have caused losses of more than $5,000,000 to the Plan in total since 2019.

4. The marketplace for services for defined contribution plans is established and competitive. Large plans, such as the Plan administered by Defendants, have sufficient bargaining power to secure high quality, competitively priced administrative and investment management services.

5. As ERISA fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2001). In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

2

6.     The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments, as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.")

7.     In this case, fiduciaries to the Plan failed to meet their fiduciary obligations in several basic ways. First, the Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants, and resulted in a loss of compounded returns. This is one of the most common and well-known examples of an imprudent investment decision.[1] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable methodology for selecting and monitoring mutual fund share classes.

8.     For a large plan of approximately $100,000,000 in net assets, such as this Plan, a fiduciary using a viable methodology should be monitoring the Plan's investment options continuously and immediately take advantage of share class discounts as they become available.

---

[1] The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf (last visited Feb. 20, 2025); *see also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf (last visited Feb. 20, 2025)

9.      Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the SEC.

10.      Based on this information, it is apparent that Defendants failed to monitor the share classes of mutual fund investments and failed to invest the Plan's funds into lower-cost share "classes," and instead invested the Plan's funds into share classes with higher fees of the very same mutual fund; thus, wasting the assets of the Plan participants.

11.      This could have been easily remedied if Defendants had a viable review process and methodology, which they neglected to keep and implement; thus, violating their duty of prudence.

12.      Second, Defendants wasted participants' money by failing to appropriately select and monitor the Plan's stable value fund, *i.e.*, the Prudential Guaranteed Income Fund. Substantially similar products were available from other providers that would have provided far higher returns to the Plan participants. Had Defendants monitored and evaluated the returns on the Plan's stable value fund, they would have realized that the Plan's stable value fund was an underperforming fund throughout the entire Class Period (defined *infra* at note 2) and the Plan's parties in interest were benefitting from the returns on the stable value fund, at the cost of the Plan's participants.

13.      Third, Defendants failed to monitor and appropriately select the Plan's bond fund. The Prudential Total Return Bond Fund had a net annual rate of return that was much less than the net annual rates of return for the similar bond funds for the same period. As a result, the Plan lost out on a larger annual net rate of return.

14.      Importantly, Plaintiff is not merely second-guessing Defendants' investment decisions with the benefit of hindsight. The information Defendants needed to make informed

4

and prudent decisions is readily available to Defendants and was available at the time these decisions were made.

16. Plaintiff, individually and as the representative of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Bob Evans Plan any lost profits. Plaintiff also seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

**JURISDICTION AND VENUE**

17. Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

18. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

19. This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District and Division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

5

**PARTIES**

20.     Plaintiff Dawn Plummer resides in Hamilton, Ohio and, at all times relevant to this action, was an employee of Bob Evans and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[2] because she and her beneficiaries were eligible to receive benefits under the Plan.

21.     The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34), covering substantially all employees of Bob Evans who have met the service requirements of the Plan. Throughout the Class Period, the Plan had between 10,000 and 30,000 participants and between $89,837,765 and $111,849,017 in assets.

22.     Defendant Bob Evans, a Delaware limited liability company, is the sponsor and administrator of the Plan and maintains its place of business at 8111 Smith's Mill Rd., New Albany, OH 43054.  The Plan's annual Form 5500 Reports filed during the Class Period identify Bob Evans as the sponsor and "Plan Administrator" of the Plan.

23.     Per Form 5500 Reports filed during the Class Period, Bob Evans appointed an investment committee (the "Committee") to manage the operation and administration of the Plan. The Committee of the Plan controls and manages the operation and administration of the Plan. Upon belief, the Board of the Directors of Bob Evans appointed the Administrative Committee of the Plan. The names of the individuals on the Board of Directors during the

---

[2] Under ERISA, claims for breach of fiduciary duty may be brought "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins on the date that is six years prior to the date of the filing of the Complaint, *i.e.*, May 8, 2019.

6

relevant time period are unknown at this time, and they may be added as defendants through amendment of this Complaint.

24. Per Form 5500 Reports filed at the beginning of the Class Period, Bob Evans contracted with Prudential Bank & Trust, F.S.B. and Prudential Retirement Insurance and Annuity Company, as the trustees to manage the operation and administration of the Plan (hereinafter, collectively the "Prudential Committee"). On October 3, 2022, Prudential Retirement Insurance and Annuity Company was renamed Empower Annuity Insurance Company. Effective March 31, 2023, Prudential Bank & Trust, F.S.B. merged with Empower Trust Company, LLC, and all services performed by Prudential Bank & Trust were assumed by Empower Trust Company, LLC.

25. Per Form 5500 Reports filed towards the middle of the Class Period (approximately 2022), Bob Evans contracted with Empower Annuity Insurance Company and Empower Trust Company, LLC, as the custodians to manage the operation and administration of the Plan (hereinafter, collectively the "Empower Committee").

26. Defendant Empower Trust Company, LLC, is incorporated in Colorado, with its headquarters in Greenwood Village, Colorado.

27. Defendant Empower Annuity Insurance Company is incorporated in the state of Connecticut, with its corporate headquarters in Hartford, Connecticut.

28. The Empower Committee kept the Prudential products and essentially kept the Plan in the same structure.

29. Defendants are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan, and have

7

discretionary authority to control the operation, management, and administration of the Plan, including the selection, monitoring, and removal of the investment options made available.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

30.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. § 1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

31.     29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

32.     29 U.S.C. § 1106(a)(1)(C), 29 U.S.C. § 1108(b)(2), and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Prudential is a "party in interest" under 29 U.S.C. § 1106(a)(1)(C).

33.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach

8

by another fiduciary and knowingly failing to cure any breach of duty. Section 1105(a) states, in relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

34. 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**<u>DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS</u>**

35. Plaintiff has relied upon limited documents provided by Defendants, including disclosures under 29 CFR § 2550.404a-5 ("404a-5"), the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), and mutual fund prospectuses available on the SEC's EDGAR database.

9

**FACTUAL ALLEGATIONS**

36.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions, plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.     Defendants Failed to Monitor, Investigate, and Offer Low Cost Investment Options**

37.     A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses, and other costs.

38.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (*i.e.*, sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen.

39.     Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan, since institutional investors make large fund share purchases, and higher

10

class shares are typically retail class shares which are available to a broader spectrum of investors.

40. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

41. Defendants had access to these low-cost institutional share classes of mutual funds, as the Plan could easily meet the minimum investment requirements. Indeed, a review of historic IRS Form 5500 filings made in connection with the Plan demonstrates that, with respect to the particular investments at issue in this case, the Plan's funds were invested in the most preferential share classes in 2017 and 2018, before reverting to higher-fee share classes in later years. As explained below, more preferential share classes were available to the Plan during the Class Period.

42. Plaintiff invested in three funds through the Plan for which Defendants failed to offer the most preferential share classes: (1) the American Funds EuroPacific Growth Fund (Class R2); (2) the JPMorgan Mid Cap Growth Fund (Class R5); and (3) the Allspring Special Mid Cap Value Fund (Class A). For each of these funds, the most preferential share class was Class R6.

43. As explained, *infra*, the Plan fiduciaries wasted the assets of the Plan by failing to monitor and investigate the available share classes and failing to conduct a reasonable analysis to select the share class of funds with the greatest returns for inclusion in the Plan menu.

Throughout the Class Period, Defendants used higher fee share classes of mutual funds when lower class shares were readily available.

44.     **American Funds EuroPacific Growth Fund.** Defendants chose American Funds EuroPacific Growth Fund Class R5E (RERHX) as an investment option available to participants in the Class Period.

45.     With respect to the American Funds EuroPacific Growth Fund, the net annual rate of return for Class R2 shares was 6.37% between January 1, 2019 and December 31, 2024. In contrast, during that same time period, the net annual rate of return for Class R6 shares was 7.53%.

46.     According to the Plan's IRS Form 5500 for the 2018 calendar year, the Plan's investment in the American Funds EuroPacific Growth Fund was $14,466,332 as of December 31, 2018.

47.     At a net annual rate of return of 6.37%, Class R2 shares of the American Funds EuroPacific Growth Fund valued at $14,466,332 on December 31, 2018 would be worth $20,954,311 on January 1, 2025. In contrast, at a net annual rate of return of 7.53%, Class R6 shares of the American Funds EuroPacific Growth Fund valued at $14,466,332 on December 31, 2018 would be worth $22,363,321 on January 1, 2025. This equates to a difference of $1,409,010 (*i.e.*, $22,363,321 minus $20,954,311).

48.     The difference in growth between Class R2 shares under the Plan and Class R6 shares demonstrates a significant loss of approximately $1,409,010 to the Plan.

49.     **JPMorgan Mid Cap Growth Fund (Class R5).** Defendants chose JPMorgan Mid Cap Growth R5 Fund (JMGFX) as an investment option available to Plan participants in the Class Period. Defendants chose to select share class R5.

50.     Defendants failed to monitor, investigate, conduct a reasonable analysis, and offer better options to the Plan.

51.     The net annual rate of return for Class R5 shares was 15.47% between January 1, 2019 and December 31, 2024. During that same time period, the net annual rate of return for Class R6 shares was 15.56%.

52.     According to the Plan's IRS Form 5500 for the 2018 calendar year, the Plan's investment in the JPMorgan Mid Cap Growth Fund was $5,640,928 as of December 31, 2018. A comparison of the growth of this 2018 year-end figure (*i.e.*, $5,640,928) between January 1, 2019 and December 31, 2024 for Class R5 shares and Class R6 shares demonstrates the Defendants' failure to monitor, investigate, and offer available lower cost mutual share classes as plan investment options.

53.     At a net annual rate of return of 15.47%, Class R5 shares of the JPMorgan Mid Cap Growth Fund valued at $5,640,928 on December 31, 2018 would be worth $13,371,051 on January 1, 2025. In contrast, at a net annual rate of return of 15.56%, Class R6 shares of the JPMorgan Mid Cap Growth Fund valued at $5,640,928 on December 31, 2018 would be worth $13,433,703 on January 1, 2025, for a difference of $62,652 (*i.e.*, $13,433,703 minus $13,371,051).

54.     **Allspring Special Mid Cap Value Fund (Class A).** Defendants chose Allspring Special Mid Cap Value A Fund (WFPAX), which changed its name from the Wells Fargo Special Mid Cap Value A, as an investment option available to participants in the Class Period. Defendants chose to select share class A, which showed an annual the net annual rate of 5.03% between January 1, 2022 and December 31, 2024.  During that same time period, the net annual rate of return for Class R6 shares was 5.47%.

13

55.     According to the Plan's IRS Form 5500 for the 2021 calendar year, the Plan's investment in the Allspring Special Mid Cap Value Fund was $3,518,371 as of December 31, 2021.  A comparison between the growth of this 2021 year-end figure (*i.e.*, $3,518,371) between January 1, 2022 and December 31, 2024 for Class A shares and Class R6 shares demonstrates that Defendants failed to monitor, investigate, conduct a reasonable analysis, and offer better options to the Plan.

56.     At a net annual rate of return of 5.03%, Class A shares of the Allspring Special Mid Cap Value Fund valued at $3,518,371 on December 31, 2021 would be worth $4,076,446 on January 1, 2025. In contrast, at a net annual rate of return of 5.47%, Class R6 shares of the Allspring Special Mid Cap Value Fund valued at $3,518,371 on December 31, 2021 would be worth $4,127,893 on January 1, 2025, for a difference of $51,447 (*i.e.*, $4,127,893 minus $4,076,446).

57.     In total, Plaintiff estimates classwide damages with respect to these three funds to be **$1,523,109** (*i.e.*, $1,409,010 plus $62,652 plus $51,447).

**B.      Defendants Failed to Appropriately Select and Monitor the Plan's Annuity**

58.     **Prudential GIF.** One of the largest assets in the Plan was the Prudential Guaranteed Income Fund ("Prudential GIF"). The Prudential GIF is an annuity payment at a guaranteed rate of return, known as the "crediting rate." At all times relevant to this case, the crediting rate for the Plan's investment in the Prudential GIF was 1.65%.

59.     A prudent fiduciary, recognizing the importance of selecting an annuity to offer as part of the Plan, would have taken great care in selecting and monitoring this investment option. However, Defendants did not.

14

60.     Plaintiff relies on the table of annuity interest crediting rates published by the Teachers Insurance and Annuity Association of America ("TIAA").[3] According to the figures published by the TIAA, as well as the year-end balances of Plan's investments in the Prudential GIF, Plaintiffs have calculated the difference between the returns they received from the Prudential GIF and the returns they should have received at the prevailing market rate for similar annuity products. Those figures are reflected in the following table.

| Year | Prior Year End Balance | Bob Evans's Crediting Rate | TIAA Crediting Rate | Yearly Return Based on Bob Evans's Crediting Rate | Yearly Return Based on TIAA's Crediting Rate | Difference |
|---|---|---|---|---|---|---|
| 2019 | $26,121,539 | 1.65% | 3.75% | $431,005 | $979,558 | $548,552 |
| 2020 | $28,344,047 | 1.65% | 3.55% | $467,677 | $1,006,214 | $538,537 |
| 2021 | $28,528,666 | 1.65% | 3.55% | $470,723 | $1,012,768 | $542,045 |
| 2022 | $17,343,664 | 1.65% | 4.66% | $286,170 | $808,215 | $522,044 |
| 2023 | $16,174,210 | 1.65% | 6.25% | $266,874 | $1,010,888 | $744,014 |
| 2024 | $14,637,884 | 1.65% | 5.38% | $241,525 | $787,518 | $545,993 |
| TOTAL | | | | | | $3,441,185 |

61.     In total, Defendants' decision to offer the Prudential GIF through the Plan—as opposed to another similar annuity product at the prevailing market rate—led to estimated classwide damages of **$3,441,185** between 2019 and 2024.

**C.     Defendants Failed to Appropriately Select and Monitor the Plan's Bond Fund**

62.     **Prudential Total Return Bond Fund.** The net annual rate of return for the Prudential Total Return Bond Fund (symbol: PDBAX) (the "Bond Fund") was 1.56% between January 1, 2020 and December 31, 2024. Plaintiff has identified several similar bond funds with substantially higher net annual rates of return for the same period, as detailed in the table below:

---

[3] *https://www.tiaa.org/public/pdf/t/tiaa-traditional-rates-advisor.pdf*.

| Bond Fund | Symbol | Net Annual Rate of Return (2020-2024) |
|---|---|---|
| Prudential Total Return Bond Fund | PDBAX | 1.56% |
| JPMorgan Core Plus Bond Fund | JCPUX | 1.93% |
| Nuveen Core Plus Bond Fund | TIBFX | 2.01% |
| MFS Total Return Bond Fund | MRBKX | 2.06% |
| Invesco Core Plus Bond Fund | CPBFX | 2.38% |

63.     Plaintiff's estimate of classwide damages in connection with the Bond Fund is based on a comparison between the growth of the Bond Fund's 2019 year-end figure (*i.e.*, $23,314,399) between January 1, 2020 and December 31, 2024 at its net annual rate of return of 1.56%, and the growth of the same amount of money during the same time period at a net annual rate of return of 2.10%—which is the average of the net annual rates of return for the similar bond funds identified above.

64.     At a net annual rate of return of 1.56%, an investment in the Bond Fund valued at $23,314,399 on December 31, 2019 would be worth $24,803,616 on January 1, 2025. In contrast, at a net annual rate of return of 2.10%, an investment in a comparable bond fund valued at $23,314,399 on December 31, 2019 would be worth $25,335,367 on January 1, 2025, for a difference of $531,751 (*i.e.*, $25,335,367 minus $24,803,616). As such, Plaintiff estimates classwide damages with respect to the Bond Fund to be $531,751.

## CLASS ACTION ALLEGATIONS

65.     ERISA authorizes any plan participant or beneficiary to bring an action individually, and on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan

16

fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the Court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

66.     Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify a class (the "Class") on behalf of participants and beneficiaries of the Plan. Plaintiff seeks to certify the following Class:

> All participants in or beneficiaries of the Bob Evans Retirement Plan from May 8, 2019 through the date of judgment.
>
> Excluded from the Class are Defendants; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

67.     This action meets the requirements of Fed. R. Civ.P. 23 and is certifiable as a class action for the following reasons:

a.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2021, the Plan had over 4,656 participants with account balances.

b.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.     whether Defendants are fiduciaries of the Plan;

ii.     whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

17

iii. whether the selection of the investment options were objectively prudent under prevailing circumstances;

iv. whether Defendants had a duty to monitor other fiduciaries of the Plan;

v. whether Defendants breached their duty to monitor other fiduciaries and parties in interest to the Plan; and

vi. the extent of damage sustained by the Plan and the appropriate measure of damages.

68. Plaintiff's claims are typical of those of the Class because her claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation.

69. Plaintiff has no interests that conflict with those of the Class.

70. Defendants do not have any unique defenses against Plaintiff that would interfere with her representation of the Class.

71. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I
### Breach of Fiduciary Duties
### (Against All Defendants)

18

72.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.     Defendants failed to discharge their duties under 29 U.S.C. § 1104(a)(1)(A) and (B). Defendants were obligated to discharge their duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

74.     Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

75.     As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached their fiduciary duties in various ways. Specifically, among other failings, Defendants (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; (ii) failed to prudently select and monitor the Plan's annuity, *i.e.*, the Prundential GIF; (iii) failed to prudently select and monitor the Plan's bond fund, *i.e.*, the Prudential Total Return Bond Fund; and (iv) failed to delegate their duties prudently, including failing to have a credible basis to conclude that the investment professionals responsible for carrying out their investment strategy were competent to do so successfully, and failing to appropriately monitor and supervise their performance.

19

76. Each Defendant was in a position to monitor and oversee the performance of other fiduciaries and failed to do so.

77. Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

78. Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

79. As a direct and proximate result of these breaches, the Plan, Plaintiff, and members of the Class suffered substantial losses in the form of higher cost and/or lower returns on their investments than they would have otherwise experienced.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of the Plan and all similarly situated Plan participants and beneficiaries, requests that the Court:

A. Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class representative, and appoint Plaintiff's counsel as Class counsel;

B. Find and declare that Defendants breached their fiduciary duties as described above;

20

C.    Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

E.    Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

F.    Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

G.    Disgorge any profits made by Defendants through the use of Plan assets, including any revenue-sharing or spread profits generated through excessive fees or insurance products tied to the Plan;

H.    Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

I.    Order the payment of interest to the extent it is allowed by law; and

J.    Grant other equitable or remedial relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Respectfully submitted,

/s/ Marc E. Dann
Marc E. Dann (0039425)
Jeffrey A. Crossman (0073461)
Brian D. Flick (0081605)
**DannLaw**

21

15000 Madison Ave.
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
**Zimmerman Law Offices P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
www.attorneyzim.com
tom@attorneyzim.com
firm@attorneyzim.com

Attorneys for Plaintiff and the Class